# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SCOTT D. OWENS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00057 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Scott D. Owens, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

Case 2:10-cv-00057-JPJ-PMS   Document 17   Filed 09/26/11   Page 1 of 25   Pageid#: 493

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Owens protectively filed his application for SSI on October 22, 2007, alleging disability as of October 22, 2007,[1] due to bursitis and arthritis of the neck, shoulders, back and knees, a crooked spine, carpal tunnel syndrome, deteriorating discs in the back, problems with discs, muscles and tendons in the back, complications from an automobile accident, cracked ribs, anxiety and depression. (Record, ("R."), at 132-36, 154, 158.) The claims were denied initially and on reconsideration. (R. at 87-89, 92, 95-96.) Owens then requested a hearing before an administrative law judge, ("ALJ"). (R. at 99.) The hearing was held on August 12, 2009, at which Owens was represented by counsel. (R. at 6-64.)

By decision dated September 4, 2009, the ALJ denied Owens's claim. (R. at 72-86.) The ALJ found that Owens had not engaged in substantial gainful activity since the date of his application. (R. at 85.) The ALJ determined that the medical evidence established that Owens suffered from severe impairments, including back, neck and shoulder pain, chronic pain, scoliosis, status post motor vehicle accident and depression and anxiety from chronic pain, but she found that Owens did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 80-81.)

---

[1] The onset date was amended at the hearing from February 28, 2006, to October 22, 2007.

The ALJ found that Owens had the residual functional capacity to perform simple, unskilled, noncomplex light work[2] that did not require overhead reaching more than rarely, that did not require climbing ladders, ropes or scaffolding and that did not require working around open, dangerous machinery. (R. at 85.) The ALJ further found that Owens could occasionally climb ramps and stairs and occasionally balance, kneel, crouch and crawl, but must work indoors in a climate controlled environment. (R. at 85.) Thus, the ALJ found that Owens was unable to perform his past relevant work. (R. at 85.) Based on Owens's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Owens could perform other jobs existing in significant numbers in the national economy, including jobs as a line attendant, an office helper and an usher, all at the light level of exertion. (R. at 84.) Therefore, the ALJ found that Owens was not under a disability as defined under the Act and was not eligible for benefits. (R. at 85.) *See* 20 C.F.R. § 416.920(g) (2011).

After the ALJ issued her decision, Owens pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-5.) Owens then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2011). The case is before this court on Owens's motion for summary judgment filed February 11, 2011, and the Commissioner's motion for summary judgment filed March 14, 2011.

---

[2] Light work involves lifting items weighing up to 20 pounds occasionally and up to 10 pounds frequently. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.927(b) (2011).

## II. Facts

Owens was born in 1966, (R. at 132), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has two years of college education and vocational training in machinery maintenance with a diesel power option certificate. (R. at 165-66.) Owens has past work experience as a self-employed singer/entertainer. (R. at 159.) The vocational expert classified Owens's job as a singer/entertainer as light and skilled. (R. at 59.) Owens testified that he worked as an entertainer, singing and playing guitar in Myrtle Beach from 2002 to 2004. (R. at 14.) He stated that he stopped working as an entertainer because it became difficult to pack his equipment, and he developed carpal tunnel syndrome in his left hand, making it difficult to play guitar. (R. at 23.) Owens testified that he had attempted to work for a construction company, but he could not work a full day due to pain. (R. at 45.) He stated that following a motor vehicle accident in 2005, he suffered from back pain that radiated down his left leg, as well as left leg weakness, and that occasionally his leg would "buckle." (R. at 28, 34, 40.) Owens stated that he occasionally had to lie down during the day. (R. at 54.) He testified that he also was involved in a four-wheeler accident in June 2007, in which he cracked three ribs, and he fell in 2009, injuring his left shoulder. (R. at 34, 36.) Owens stated that he received a steroid injection in his shoulder, but surgery was still being considered. (R. at 38.) He stated that Lortab, Klonopin and the steroid injection, in combination, helped his shoulder pain. (R. at 40.) Owens also testified that he had been receiving mental health counseling for approximately one year, which had helped. (R. at 53.)

Jean Hamrick, a vocational expert, also was present and testified at Owens's hearing. (R. at 58-63.) She classified Owens's past work as an entertainer as light and skilled. (R. at 59.) Hamrick testified that a hypothetical individual of Owens's age, education and work history who could perform simple, noncomplex light work, but who could not climb ladders, work at heights, operate dangerous or vibrating machinery, reach overhead except intermittently, occasionally crouch, crawl and stoop and who should work indoors in a temperature controlled environment, could not perform Owens's past relevant work. (R. at 60.) However, she testified that such an individual could perform the jobs of a line attendant, an office helper and an usher or lobby attendant. (R. at 60.) Hamrick next testified that the same individual, but who had to change postures briefly and in place every hour, could perform the same jobs. (R. at 61.) Hamrick stated that the same hypothetical individual, but who could perform only sedentary[3] work, could perform the jobs of a telephone answerer, a clerical helper and a bench worker. (R. at 61-62.) Hamrick testified that an individual with the limitations set forth in the June 2009 mental assessment completed by Crystal Burke, could not perform any jobs. (R. at 62-63.)

In rendering her decision, the ALJ reviewed records from Virginia Public Schools; Stone Mountain Health Services; Buchanan Health Care; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Dr. Dia Owens, M.D.; Dr. Frank M. Johnson, M.D., a state

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2011).

- 5 -

agency physician; Louis Perrott, Ph.D., a state agency psychologist; Merritt Physical Therapy; University of Virginia; and Crystal Burke, L.C.S.W.

Owens was involved in a motor vehicle accident on January 18, 2005. (R. at 377-79.) X-rays of the lumbosacral spine dated January 19, 2005, were normal. (R. at 380-81.) A lumbar MRI dated March 1, 2005, showed rotoscoliosis. (R. at 275, 376.) Spinal x-rays dated March 21, 2005, showed mild rotoscoliosis to the right in the mid to lower thoracic spine with compensatory rotoscoliosis in the lumbar spine with convexity to the left. (R. at 375.) A bone scan of the thoracolumbar junction dated April 6, 2005, was normal. (R. at 373.) X-rays of the dorsolumbar spine dated the same day also were normal. (R. at 374.) An MRI of the thoracic spine dated May 12, 2005, showed minimal spurring of the vertebrae with a small central and left paracentral disc protrusion at the T8-T9 level of the spine. (R. at 371-72.)

Owens received treatment at Stone Mountain Health Services, ("Stone Mountain"), from October 25, 2006, through July 22, 2009, for complaints of back pain, left hip pain, right knee pain, neck pain, insomnia secondary to pain, elevated blood pressure, lower leg pain, right rib pain, GERD, anxiety and left shoulder pain. (R. at 228-62, 301-06, 350-64, 398-412, 435-37.) Mental status examinations were normal throughout this time. (R. at 229, 232, 234, 237, 240, 243, 246, 249, 252, 255, 258, 261, 302, 305, 351, 354, 357, 360, 363, 399, 402, 405, 408, 411, 436.) On October 25, 2006, Owens reported worsening back, neck and left hip pain, as well as insomnia. (R. at 260-62.) Dr. Dia Owens, M.D., continued Lortab, and Owens's dosage of trazodone was increased. (R. at 262.) On November 28, 2006, Owens's back pain was "overall stable," and he reported that the trazodone

- 6 -

increase did not help his insomnia. (R. at 257.) However, he noted some relief with lidocaine patches. (R. at 257.) Dr. Owens diagnosed chronic low back pain, insomnia and hypertension. (R. at 259.) Trazodone was discontinued, and Klonopin was initiated. (R. at 259.) On January 26, 2007, Owens's blood pressure had improved, but he reported daily leg pain and numbness from the knees down, worse with activity. (R. at 254.) He reported that Lortab helped his back pain, but not the leg pain, and he stated that Mobic also did not help. (R. at 254.) Klonopin helped with insomnia, but left him feeling "groggy." (R. at 254.) Lortab was continued, and the Klonopin dosage was altered to decrease negative side effects. (R. at 256.) On March 13, 2007, Owens again reported back pain relief with Lortab. (R. at 251.) On April 12, 2007, Owens again reported that activity worsened his pain. (R. at 248.) He stated that Klonopin was no longer helping his insomnia, but that lidocaine patches helped "a little" with his pain. (R. at 248.) Owens's dosage of Klonopin was increased. (R. at 250.) On May 14, 2007, Owens reported that his back pain was about the same. (R. at 245.) He further reported "getting used to" the Klonopin again, as it did not seem to be as helpful as previously. (R. at 245.) He was continued on his medications, and his dosage of Klonopin was again increased. (R. at 247.) Owens was instructed to increase activity as tolerated. (R. at 247.)

On June 13, 2007, Owens's pain was about the same, and he noted that increased Klonopin helped with his insomnia. (R. at 242.) Dr. Owens stated that Owens's back pain was "overall stable," and she continued his medications. (R. at 242, 244.) On June 19, 2007, Owens reported having an ATV accident two days previously, causing right rib pain. (R. at 239.) He was tender to palpation over the lower ribs, and he had bruising on the right upper arm and elbow. (R. at 240.) He

- 7 -

was advised that he likely had cracked or broken ribs, and he was given Percocet for pain. (R. at 241.) On July 3, 2007, Owens complained of continued, but improved, right rib pain. (R. at 236.) He was continued on Percocet, but advised that he would need to switch back to Lortab once the acute pain issues were resolved. (R. at 238.) On July 30, 2007, Owens again complained of continued, but improved, rib pain, noting that he felt pretty good during the day, but had to take extra Lortab to sleep. (R. at 233.) He reported pain across the epigastric area, worsened with deep breathing. (R. at 233.) Owens received a Toradol injection, and he was instructed to continue taking extra Lortab at night as needed. (R. at 235.) On August 10, 2007, Owens reported improved rib pain. (R. at 231.) On September 21, 2007, Owens continued to report soreness around the diaphragm, especially when lying down. (R. at 228.) He reported that Klonopin was helping with his insomnia. (R. at 228.) Owens stated that he had been helping his brother-in-law with construction work. (R. at 228.) He was prescribed Aciphex for gastroesophageal reflux disease, ("GERD"). (R. at 230.) On December 20, 2007, Owens reported worsened neck pain with cold weather, and he continued to complain of pain across the diaphragm that would "work itself out" after being up for about 30 minutes. (R. at 304.) He stated that Lortab helped some, but did not last long enough. (R. at 304.) He stated that he was applying for disability, noting that he could not even walk up and down stairs much anymore. (R. at 304.) His medications were continued. (R. at 306.)

On December 26, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Owens did not suffer from a medically determinable impairment. (R. at 280-92.) Leizer specifically noted that treatment since 2006 showed relatively normal

mental status examinations and that Owens had received no formal mental health treatment or inpatient psychiatric admissions. (R. at 292.)

The same day, Dr. Joseph Duckwall, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Owens could perform medium[4] work. (R. at 293-99.) He imposed no postural, manipulative, visual, communicative or environmental limitations on Owens. (R. at 295-96.) Dr. Duckwall noted that Owens described activities of daily living that were not significantly limited in relation to his alleged symptoms. (R. at 299.) He found Owens's statements partially credible. (R. at 299.)

Owens returned to Stone Mountain on February 25, 2008, with complaints of right knee pain after falling on a brick sidewalk. (R. at 301.) X-rays of the right knee were normal, and Owens received a Toradol injection. (R. at 303, 307.) On April 9, 2008, Owens complained of continued knee pain, stating that it felt like his knee cap had "moved out of place." (R. at 362.) He also reported anxiety. (R. at 362.) Owens's back pain, GERD and insomnia were stable with medication. (R. at 362.)

On May 2, 2008, Dr. Frank M. Johnson, M.D., a state agency physician, completed another Physical Residual Functional Capacity Assessment, finding that Owens could perform medium work. (R. at 309-15.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 311-12.) Dr. Johnson stated that Owens had described daily activities that were not

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2011).

significantly limited in relation to his alleged symptoms, and he found his statements to be partially credible. (R. at 314-15.)

On May 5, 2008, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF, finding that Owens did not suffer from any medically determinable impairment. (R. at 316-29.) Perrott noted that mental status examinations since 2006 were normal and that Owens had received no formal mental health treatment, nor had he undergone any inpatient psychiatric admissions. (R. at 328.)

Owens returned to Stone Mountain on June 10, 2008, with continued complaints of low back pain with occasional left leg pain. (R. at 359.) Owens stated that although he tried to help his family with construction work, he could not tolerate it. (R. at 359.) Owens reported receiving counseling from Crystal Burke, L.C.S.W. at Stone Mountain. (R. at 359.) However, Owens did not relate any mental health complaints to Dr. Owens, and a mental status examination was normal. (R. at 360.) Dr. Owens diagnosed anxiety/insomnia/depression in addition to his other previously-diagnosed maladies, and she advised him to increase his activity as tolerated. (R. at 361.) Owens was continued on medication, and he was advised to continue working on coping skills and to follow up with Burke as needed. (R. at 361.) On August 12, 2008, Owens continued to complain of chronic back pain. (R. at 356.) He received a Toradol injection and was advised to continue Lortab and increase activity as tolerated. (R. at 358.) On October 10, 2008, Owens stated that he injured his back moving boxes the previous day. (R. at 353.) He further reported not sleeping well the previous few nights because his wife left and took the children with her. (R. at 353.) He reported shooting pain down his left hip.

- 10 -

(R. at 353.) Owens was tearful, but mental status again was deemed normal. (R. at 354.) He received another Toradol injection, and x-rays of the lumbosacral spine were normal. (R. at 355, 365.) On December 19, 2008, Owens reported "hurting a little more this week," stating that he "slept wrong." (R. at 350.) He stated that Toradol had helped in the past. (R. at 350.) Owens stated that his wife and children had not returned, and he continued to see Burke for counseling, but mental status examination was again normal. (R. at 350-51.) His sleep was "ok" with Klonopin. (R. at 350.) Dr. Owens diagnosed chronic back pain and anxiety disorder/depression. (R. at 352.) Owens received another Toradol injection and was advised to continue his medications and counseling. (R. at 352.)

When Owens saw Burke on November 25, 2008, for counseling, he reported having a very bad couple of months, noting that, in addition to his pain and inability to work, his wife and children left him. (R. at 349.) He reported some passive suicidal thoughts, but stated that he could not act on these. (R. at 349.) He also reported frequent crying episodes, sleep disturbance, feelings of worthlessness, uselessness and anhedonia. (R. at 349.) He was alert and oriented, his mood was very depressed, his thought content had depressive features, and he was tearful during the interview. (R. at 349.) Burke found that Owens's already-existing major depressive episode was compounded by his wife leaving. (R. at 349.) They discussed coping strategies. (R. at 349.) Burke allowed Owens to vent and encouraged him to follow up with behavioral health as needed. (R. at 349.) On December 23, 2008, Owens reported feeling very down, noting his continued separation from his wife and children. (R. at 348.) However, he noted that he had been talking with his wife and hoped to reconcile. (R. at 348.) He denied suicidal ideation, but continued to complain of pain. (R. at 348.) Owens reported that an

increased dosage of Klonopin had helped him sleep better. (R. at 348.) He was alert and oriented, his mood appeared depressed, and he was tearful at times during the interview. (R. at 348.) Burke noted multiple situational stressors and that Owens had poor coping strategies. (R. at 348.) Owens continued to present with symptoms of a major depressive disorder, and Burke encouraged him to talk to his primary care provider about antidepressant therapy.[5] (R. at 348.) On January 27, 2009, Owens reported that he and his wife had reconciled and that he was feeling more content. (R. at 347.) He denied suicidal or homicidal ideations. (R. at 347.) Owens was alert and oriented, and his mood seemed less depressed than at his previous visit. (R. at 347.) He continued to exhibit symptoms of depression, but had less situational and family stressors since reconciling with his wife. (R. at 347.) Stressors and coping strategies were discussed. (R. at 347.)

On February 18, 2009, Owens complained of having more pain down his left leg, including sharp, shooting pain, as well as numbness. (R. at 410.) He also reported left shoulder pain with decreased range of motion. (R. at 410.) He received a Toradol injection and was continued on medications. (R. at 412.)

On March 3, 2009, Owens reported to Burke that things were going well at home and that he and his wife were doing better. (R. at 415.) He reported some anxiety and low mood, especially related to poor quality of life and pain, but denied suicidal or homicidal ideations. (R. at 415.) Owens was alert and oriented with a depressed and anxious mood. (R. at 415.) He continued to exhibit some anxiety and depression related to pain and poor quality of life, but appeared to be

---

[5] There are no notes in the record reflecting either that Owens ever spoke with Dr. Owens about this or that he was prescribed antidepressants.

doing better since his wife and children had returned home. (R. at 415.) They again discussed coping strategies, and Burke allowed Owens to vent. (R. at 415.)

On March 18, 2009, Owens continued to complain of left shoulder pain with decreased range of motion and occasional numbness, especially at night. (R. at 407.) He reported that his back pain continued to worsen. (R. at 407.) Owens also complained of continued anxiety and insomnia. (R. at 407.) He was oriented, and his mood and affect were normal. (R. at 408.) He received another Toradol injection, and he was advised to continue his medications. (R. at 409.) On April 1, 2009, Owens was in more pain after having moved furniture. (R. at 404.) He requested a Toradol injection. (R. at 404.) Owens reported sharp, stabbing pain, especially with driving. (R. at 404.) He was oriented with a normal mood and affect. (R. at 405.) An x-ray of Owens's left shoulder taken on April 10, 2009, was normal. (R. at 413.)

When Owens saw Burke on April 14, 2009, he reported being especially stressed the previous few weeks due to his wife's illness as the result of a medication side effect. (R. at 416.) Owens reported being able to sleep only with the assistance of Klonopin, but he denied any suicidal or homicidal ideations. (R. at 416.) He appeared alert and oriented and was only mildly anxious and depressed. (R. at 416.) Burke stated that Owens was not as depressed as before since reconciling with his wife. (R. at 416.) He continued having problems coping with stress and chronic pain, and he often had mood problems as a result of coping with chronic pain. (R. at 416.) They discussed coping strategies and relaxation techniques. (R. at 416.)

An MRI of Owens's left shoulder dated April 20, 2009, showed a SLAP tear,[6] and the acromioclavicular joint had a mild mass effect on the underlying supraspinatus musculotendinous joint. (R. at 393-94.) An MRI of the lumbar spine taken the same day showed mild lumbar levoscoliosis with superimposed mild multilevel degenerative lumbar spondylosis without significant central canal or neural foraminal stenosis at any level. (R. at 395-96.) It also showed an abnormal signal within the bone marrow diffusely throughout the vertebral bodies, which was noted to be nonspecific and could be seen in any of a variety of benign and malignant conditions. (R. at 396.)

On May 19, 2009, Owens stated that his pain was about the same, and he reported continued anxiety and insomnia. (R. at 401.) He was oriented with a normal mood and affect. (R. at 402.) Dr. Owens advised him to continue his medications. (R. at 403.) On May 27, 2009, Owens requested a Toradol injection, reporting continued back and shoulder pain. (R. at 398.) He was oriented with a normal mood and affect. (R. at 399.) Owens received a Toradol injection, and he was referred to the University of Virginia for an orthopedic evaluation and treatment of the SLAP tear. (R. at 400.) When Owens saw Burke the same day for counseling, he reported irritability, frustration and difficulty concentrating. (R. at 417.) He was alert and oriented with a depressed mood. (R. at 417.) He continued to exhibit some depression and anxiety, but reported that he was sleeping better with Klonopin and coping some better with stress since his family had returned.

---

[6] A SLAP tear is an injury to a part of the shoulder joint called the labrum. SLAP stands for Superior Labrum from Anterior to Posterior. The SLAP tear occurs at the point where the tendon of the biceps muscle inserts on the labrum. *See SLAP Tear Definition,* ABOUT.COM, http://orthopedics.about.com/cs/generalshoulder/a/slap.htm (last visited September 22, 2011).

(R. at 417.) Burke encouraged coping strategies and relaxation techniques. (R. at 417.)

Burke completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on June 23, 2009, finding that Owens had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out both simple and detailed instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 418-20.) Burke found that Owens had a poor or no ability to deal with the public, to use judgment, to deal with work stresses and to understand, remember and carry out complex job instructions. (R. at 418-19.) Burke found that Owens could manage benefits in his own best interest and that he would be absent from work more than two days monthly. (R. at 420.)

When Owens again saw Burke on July 7, 2009, he reported being easily frustrated, often getting down because of his inability to perform certain activities. (R. at 430.) However, he reported sleeping well with medications. (R. at 430.) Owens was alert and oriented, but was depressed and anxious. (R. at 430.) He continued to have problems coping with chronic pain, and he had poor coping strategies. (R. at 430.)

On July 8, 2009, Owens saw Dr. David M. Kahler, M.D., at the University of Virginia for an orthopedic evaluation of his left shoulder injury. (R. at 427-28.) Dr. Kahler performed a physical examination and reviewed the MRI. (R. at 427.)

- 15 -

He opined that Owens's history was much more consistent with a cuff contusion rather than an acute labral tear. (R. at 427.) Therefore, he administered a steroid injection into the shoulder. (R. at 427.) Owens had good initial relief of his symptoms, and Dr. Kahler stated that if this calmed the cuff contusion and provided good pain relief, surgical management of the SLAP tear need not be considered. (R. at 427.) Owens was scheduled to return in six weeks to check his progress. (R. at 427.) Dr. Kahler noted that if Owens had a good temporary response, but his symptoms recurred, he likely would receive another injection. (R. at 427.) If, then, he had minimal benefit, diagnostic arthroscopy could be discussed. (R. at 427.)

On July 22, 2009, Owens reported that the shoulder injection helped "at least 50%." (R. at 435.) However, he requested a pain injection for his back. (R. at 435.) Owens was oriented with a normal mood and affect. (R. at 436.) He was diagnosed with chronic back pain and resolving left shoulder pain. (R. at 437.)

On July 31, 2009, Dr. Owens wrote a letter stating that Owens suffered from daily pain as the result of previous accidents. (R. at 429.) She stated that his condition interfered with his ability to work, noting that he had attempted to work at Barnette Construction, but was unable to perform his duties there due to his physical disabilities. (R. at 429.) Dr. Owens opined that it was unlikely that Owens would regain the capacity to hold down a full-time position and should be considered for social security disability benefits. (R. at 429.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Owens argues that the ALJ erred by failing to obtain medical expert testimony at the hearing regarding the severity of his mental impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.) He also argues that the ALJ erred by failing to give

- 17 -

controlling weight to the opinion of his treating physician, Dr. Owens. (Plaintiff's Brief at 6-7.) Lastly, Owens argues that the ALJ erred by failing to give appropriate weight to the opinion of Burke regarding the severity of his mental impairments and their resulting effect on his ability to work. (Plaintiff's Brief at 7-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

- 18 -

I find Owens's argument that the ALJ erred by failing to obtain medical expert testimony regarding the severity of his mental impairments unpersuasive. I also find that the ALJ did not err by affording little weight to Burke's June 2009 mental assessment. I further find that the ALJ accounted for Owens's mental impairments and resulting limitations by limiting him to the performance of simple unskilled work.

According to the regulations, an ALJ may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and on whether such impairments equal the requirements of any listed impairment. *See* 20 C.F.R. § 416.927(f)(2)(iii) (2011). Thus, the regulations permit an ALJ to obtain a medical expert, but do not mandate it. Owens argues that the ALJ should have obtained medical expert testimony based on the ALJ's statement that it is not entirely clear what the claimant's mental diagnoses are. The ALJ did state this in her opinion. The court finds that this is incorrect, as Dr. Owens diagnosed anxiety and depression. (R. at 352, 355, 361.) However, the ALJ proceeded to thoroughly analyze all the relevant evidence, concluding that Owens did not suffer from a disabling mental impairment. In particular, the ALJ analyzed in detail whether Owens's mental impairments met the medical listings for affective disorders or anxiety-related disorders, concluding that they did not. It is clear from the ALJ's thorough decision and the evidence of record now before the court that there was adequate evidence on which to base a decision, thereby rendering medical expert testimony unnecessary.

Dr. Owens, Owens's treating physician, made diagnoses of anxiety and depression in June 2008, October 2008 and December 2008. However, Dr. Owens

never prescribed any psychotropic medications for Owens,[7] nor did she impose any limitations on his activities as a result of any mental impairment. Also, it is unclear from Dr. Owens's treatment notes the basis for these diagnoses. It does not appear that Owens complained of depression or anxiety, and mental status examinations were consistently unremarkable. Both state agency psychologists found that Owens did not suffer from any medically determinable mental impairment. (R. at 280-92, 316-29.) Additionally, Owens did not begin seeing Burke for counseling until the later part of 2008 after his wife and children left him. Burke's treatment notes reflect that Owens's symptoms were exacerbated after his wife left him, and they improved after they reconciled. The only limitations noted in Burke's treatment notes were problems coping with stress and chronic pain and that Owens often had mood problems as a result thereof. (R. at 348, 416.) Nonetheless, a mental assessment completed by Burke in June 2009 indicated that Owens was either seriously limited, but not precluded, or had no useful ability in all areas of work-related mental functioning. (R. at 418-20.) She provided no explanation for such findings, and, for the reasons stated above, they are not supported by the objective evidence of record.

Owens has indicated that he has difficulty with memory, concentration and completing tasks. However, I find that the ALJ accommodated these symptoms by limiting Owens to the performance of simple unskilled work.

It is for all of these reasons, that I find that substantial evidence supports the ALJ's failure to obtain expert medical testimony regarding the nature and severity

---

[7] Although Dr. Owens prescribed Klonopin, it was primarily for insomnia.

Case 2:10-cv-00057-JPJ-PMS   Document 17   Filed 09/26/11   Page 20 of 25   Pageid#: 512

of Owens's mental impairments, as well as the ALJ's decision to accord little weight to the June 2009 mental assessment completed by Burke.

Owens also argues that the ALJ erred by failing to give controlling weight to the opinions of his treating physician, Dr. Owens. Again, I disagree. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d)(2) (2011). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Owens argues that the court erred by failing to grant controlling weight to Dr. Owens's opinion, set out in a July 2009 letter, that Owens would unlikely "regain the capacity to hold down a full time position and should be considered for disability benefits." I find, for the following reasons, that the objective and substantial evidence of record does not support such an opinion. First, I find that neither Dr. Owens's own treatment notes, nor the radiographic evidence, support such an opinion. Owens saw Dr. Owens from October 2006 through July 2009, primarily for complaints of elevated blood pressure, back, leg, right knee, left shoulder and neck pain, leg weakness and insomnia secondary to pain. Dr. Owens

consistently prescribed Lortab for pain and Klonopin for insomnia. Owens reported relief of back pain with Lortab, and he stated that Klonopin helped his insomnia. On June 13, 2007, Dr. Owens deemed Owens's back pain "overall stable." (R. at 242.) Although Owens cracked three ribs in June 2007, by August 2007, he reported improved rib pain. (R. at 231, 240.) Although he complained of right knee pain after falling on a brick sidewalk, x-rays were normal. (R. at 301, 303, 307.) Owens received multiple Toradol injections, which he stated helped his pain. (R. at 303, 350, 352, 355, 358, 400, 404, 409, 412, 435.) October 10, 2008, x-rays of Owens's lumbosacral spine were normal. (R. at 365.) In February 2009, Owens complained of left shoulder pain after falling. (R. at 410, 412.) An April 10, 2009, x-ray of Owens's shoulder was normal. (R. at 413.) However, an April 20, 2009, MRI revealed a SLAP tear to the left shoulder. (R. at 393-94.) An MRI of Owens's lumbar spine taken the same day showed mild levoscoliosis and mild degenerative lumbar spondylosis without significant stenosis at any level. (R. at 395-96.) Dr. Kahler, an orthopedist at the University of Virginia, opined in July 2009 that Owens likely had a cuff contusion as opposed to a SLAP tear, which he opted to treat conservatively with a steroid injection. (R. at 427.) Dr. Kahler noted that if such injections did not help, surgical management would be considered. (R. at 427.) Dr. Kahler imposed no restrictions on Owens's activity. In July 2009, Owens reported that the shoulder injection helped "at least 50%." (R. at 435.) Over the entire course of treatment with Dr. Owens, she never imposed any restrictions on Owens, instead, consistently stating that he could increase activity as tolerated.

I further find that Dr. Owens's opinion is not supported by the opinions of the state agency physicians, both of whom found that Owens could perform medium work. (R. at 293-99, 309-15.) Additionally, I find that Owens's reported

activities of daily living undercut Dr. Owens's opinion of disability. For instance, in March 2008, he indicated that he prepared simple meals, tried to help with household chores, such as laundry and straightening up, went outside two to three times weekly and visited family. (R. at 195-97.) Lastly, I note that the opinion of disability is explicitly reserved to the Commissioner because it is an administrative decision that is dispositive of the case. *See* 20 C.F.R. § 416.927(e)(1) (2011). Therefore, a medical source's opinion as to a claimant's disability is not controlling.

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's decision not to obtain medical expert testimony regarding Owens's mental impairments, as well as his weighing of the evidence as to both Owens's mental and physical impairments. Therefore, I find that substantial evidence supports the ALJ's finding that Owens is not disabled and not entitled to SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's decision not to obtain expert medical testimony regarding the nature and severity of Owens's mental impairments;

2. Substantial evidence exists in the record to support the ALJ's weighing of the evidence related to Owens's mental impairments;

3. Substantial evidence exists in the record to support the ALJ's weighing of the evidence related to Owens's physical impairments; and

4. Substantial evidence exists in the record to support the ALJ's finding that Owens was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Owens's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      September 26, 2011.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE